# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

SUSAN WOLCHOK,

      Plaintiff,

v.

LAW OFFICES OF GARY
MARTIN HAYS & ASSOCIATES,
P.C.,

      Defendant.

CIVIL ACTION NO.
1:07-CV-765-CC

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED[1]

1.

Defendant is a Georgia law firm, which handles personal injury, workers' compensation and wrongful death cases throughout Georgia. (Complaint, ¶ 15; Hays Dep. at 14-16)

---

[1] Unless otherwise indicated, deposition excerpts and exhibits referred to herein are filed separately as attachments to Plaintiff's Appendix of Relevant Exhibits. Plaintiff's Exhibits 1- 51 ("Pl. Ex. _") are all exhibits to depositions taken in this case. Plaintiff's Exhibits 52-72are not. Defendant's Exhibits 1- 18 ("Def. Ex. _") are all exhibits used by the defendants in the depositions taken in this case. Plaintiff has not adopted defendant's new exhibit numbers used in its brief.  All exhibits referred to in this brief will be filed simultaneously with the court. The originals of any depositions will be filed conventionally. Depositions excerpts will be filed as Plaintiff's Exhibit 73.

RESPONSE: Admit.

## 2.

Defendant maintains offices in the Atlanta and Athens, Georgia areas. (Complaint, ¶ 15; Hays Dep. at 17; Hays Decl., ¶ 3)

RESPONSE: Admit.

## 3.

From 1993 until 2005, Defendant's Atlanta office was located at 1979 Lakeside Parkway, Tucker, Georgia. (Hays Dep. at 17)

RESPONSE: Admit.

## 4.

On May 21, 2005, Defendant relocated its Atlanta office to 3098 Breckinridge Boulevard, Duluth, Georgia. (G. Hays Dep. at 17; Mincey Dep. at 100; Exhibit A to Hays Decl.)

RESPONSE: Admit.

## 5.

Since its inception, Defendant has always paid 100% of its employees' health insurance premiums. (Hays Decl., ¶ 6)

RESPONSE: Denied. Not all of Defendant's employees are covered under its group health insurance plan, including but not limited to the following persons who were employed in the first quarter, 2006:

Brown, Margo
Harris, Janice
Haskins, Kara
Hays, Charles
Hays, Sheri
Jackson, Tamara
Knott, Garnet
Martin, Kim
Moore, Stacie
Nelson, Sloan
Pacheco, Judith
Provitt, Ronda
Reyes, Nancy
Rivas, Josue
Roberts, Lauren
Smith, Patty
Williams, Samantha

Of the employees listed above, who, in the first quarter of 2006, had health insurance with the Defendant, only two covered their children, and only partners Gary Hays and Derek Hays, and associate Philip Milam covered their families. (Pla. Ex. 61, Ex. 62; Attachment 1; Ex. 68, Attachment 4) In addition, Defendant does not pay for any health insurance for its India employees. (Hays Dep. at 40, lns. 4-6)

6.

Had Defendant been concerned about the cost of providing health insurance benefits to any of its employees, Defendant could have required employees to pay a percentage of their premiums, which it never did. (Hays Decl., ¶ 7)

RESPONSE: Denied. Gary Hays admits he was concerned about the cost of health insurance. (Hays Dep. at 40, lns. 7-15; 263, lns. 15-20) Gary Hays made a lot of complaints to the Plaintiff about the high cost of insurance. (Pla. Dep. at 180 lns. 6-16) He told the Plaintiff of his plan to fire April Ruff, which would cancel her health insurance and then he could rehire her but she wouldn't be covered on the insurance. (Pla. Dep. at 268-270) Vanessa Mincey also told the Plaintiff that the firm was going to take the position that April Ruff had quit, in order to get out of paying health insurance. (Pla. Dep. at 268- 270)

When Sia Amadu was pregnant, Gary Hays and Derek Hays also complained to Amy Smith, an associate attorney with the Defendant, about the cost of insurance, and the impact that employees having children would have on health insurance premiums.  (Smith Dep. at 13- 14) Gary and Derek Hays also discussed with Amy Smith on more than one occasion while Sia Amadu was pregnant that they wanted to fire Sia Amadu because they were frustrated with her about her pregnancy being out of wedlock, her anticipated absences since she would be a single mother, as well as the cost of her health insurance. (Smith Dep. at 45) Finally, Gary Hays sent an email to his staff on January 17, 2006, regarding the proposed rate increase, reflecting his concern about increased costs of health insurance. (Pla. Ex. 13)

In addition, in order for the group plan to be approved, 75% of the eligible employees had to be enrolled. (Pla. Ex. 61) If the monthly premium was too high, there is always a danger that not enough employees would opt to purchase the insurance.

7.

Defendant began efforts to change insurance carriers after Defendant's Office Manager, Vanessa Mincey ("Ms. Mincey"), received information from Defendant's insurance carrier that there would be an increase in Defendant's premiums for its health insurance coverage. (Mincey Dep., p. 21; Hays Dep., p. 182).

RESPONSE: Denied.  Defendant's office procedure outlines that Linda Penegar brings Mr. Hays all administrative mail for the firm, which he then opens and reads. There is no evidence that the proposed rate increase was addressed to Vanessa Mincey instead of Gary Hays. (Hays dep. at  96 lns. 22-25; 97, ln. 1) Plaintiff admits that Defendant received notice in late 2005 or early January, 2006, that it's insurance premiums would be increasing.  According to the proposal given to Defendant on or about January 12, 2006, Plaintiff's insurance premium for individual coverage was one of the highest among Defendant's employees. Only two employees, both of whom were 66 years old (Linda Penagar and Laura Wilson), had insurance premiums higher than Plaintiff. (Pla. Ex. 71, p. 3)  Other

than being pregnant, Plaintiff had no medical condition for which she had been or

was receiving treatment. (Def. Ex. 15)

8.

As Defendant's Office Manager, Ms. Mincey's job duties include

administration of Defendant's benefit plans. (Mincey Dep., pp. 5-6; Hays Dep., p.

27).

RESPONSE: Admit in part, deny in part.  Although Vanessa Mincey did have

some duties regarding administering the benefits plans, Gary Hays made all

financial decisions relating to his law firm, including its health insurance costs.

Defendant's Exhibit 7 reflects that he reviewed the insurance quotes for the group

health insurance, and, thus, had final authority.

9.

Ms. Mincey requested, and obtained, approval from Gary Hays ("Mr.

Hays"), Defendant's owner and President, to explore other insurance coverage.

Mincey Dep.p.22; Hays Dep., p. 182; Hays Decl., ¶ 2).

RESPONSE: Denied, Gary Hays was the individual who instructed Vanessa

Mincey to start investigating the costs of other plans. Plaintiff's Exhibit 13 reflects

that Mr. Hays sent the memo out regarding the insurance rate increase and is the

person to whom the employees were to return the employee and dependent

information, as well as medical history.  In addition, when Plaintiff tried to speak

with Gary Hays on January 30, 2006, he told her that he was going to have to "buzz later…going over health insurance quotes." (Def. Exhibit 7)

10.

Ms. Mincey subsequently utilized an insurance broker to research available coverage and provide her with the names of three companies that had comparable premiums and levels of service. (Mincey Dep., p. 22; Hays Dep., p. 182).

RESPONSE: Deny in part, admit in part. Plaintiff admits that the Defendant used an insurance broker to research available health insurance coverage; however, the insurance estimates did not have comparable levels of service or comparable premiums. In fact, after the firm changed insurance, Plaintiff received less coverage than other employees even though comparable coverage was available. Plaintiff was enrolled in a Preferred Provider Plan (PPO), whereas the remaining employees were in a "Point of Service" (POS) plan. The replacement coverage obtained effective February 1, 2006, provided fewer benefits than the POS plan. For example, while other employees had a $20 co-pay, Plaintiff had a $25 co-pay. Also, the POS plan paid 100% in network, while the PPO plan only covered 60%. (Pla. Ex. 60 ¶ 61; Ex. 61, Attachment 2; Ex. 71 pp. 3, 8-10)

11.

Based on the information provided by the insurance broker, Ms. Mincey decided which insurance carrier and plan to utilize. (Mincey Dep., pp. 22-23).

7

RESPONSE: Denied. Gary Hays made all decisions relating to his law firm and its health insurance costs. In Defendant's Exhibit 7, Gary Hays states: "I'll have to buzz later… going over health insurance quotes," which reflects that he was involved in the decision as to what insurance coverage to select. In addition, Gary Hays is the person who sent the employees a request for application information and is the person to whom the applications were returned. (Pla. Ex. 13)

12.

Ms. Mincey's decision regarding Defendant's insurance coverage was based on the premium amount, as well as the level of service offered by the insurance carrier.  (Mincey Dep., p. 23).

RESPONSE: Denied. Gary Hays made all decisions relating to his law firm and its health insurance costs. In Defendant's Exhibit 7, Gary Hays states: "I'll have to buzz later… going over health insurance quotes," which reflects that he was involved in the decision as to what insurance coverage to select. In addition, Gary Hays is the person who sent the employees a request for application information and is the person to whom the applications were returned. (Pla. Ex. 13)

Furthermore, the Defendant had the option of providing Plaintiff with health insurance comparable to that of her co-workers, however, the Defendant chose to purchase insurance for her that did not provide the same level of coverage but which was cheaper. (Pla. Ex. 60 ¶ 61; 61, Attachments 2; Ex. 71 pp. 8-10)

13.

Mr. Hays was not involved in obtaining quotes from insurance companies regarding insurance coverage, or in the decision regarding the selected insurance carrier. (Mincey Dep., pp. 22-23, 100; Hays Dep., pp. 82-83).

RESPONSE: Denied. Gary Hays made all decisions relating to his law firm and its health insurance costs. In Defendant's Exhibit 7, Gary Hays states: "I'll have to buzz later… going over health insurance quotes," which reflects that he was involved in the decision as to what insurance coverage to select. In addition, Gary Hays is the person who sent the employees a request for application information and is the person to whom the applications were returned. (Pla. Ex. 13)

14.

Plaintiff commenced employment with Defendant on or about May 6, 2003. (Complaint, ¶ 16).

RESPONSE: Admit.

15.

Plaintiff was hired to head Defendant's workers' compensation department so Mr. Hays could devote his time to other activities, including numerous philanthropic activities. (Pla. Dep., p. 89; Exs. 2, 11, p. 2 and 12, p. 2 to Pla. Dep.; Hays Decl., ¶ 9).

RESPONSE: Denied. Plaintiff was hired as a workers' compensation associate

attorney to replace Chris Ringue, who had been terminated by the Defendant.

(Hays Dep. at 42; lns. 20-23)  At the time that Plaintiff was hired, Gary Hays was

also working in the workers' compensation department and he was in charge of the

department; the Plaintiff was merely an associate attorney handling an individual

caseload within the workers' compensation department. (Hays Dep; at 41, ln. 23;

42, ln. 5) There is nothing on page 89 of Plaintiff's deposition which supports the

proposition that she was hired to head the workers' compensation department.

Gary Hays did not hand over a portion of his caseload to Plaintiff until he took a

leave of absence from the law firm while he underwent surgery. (Pla. Ex. 60 ¶ 75)

(Def. Ex 11 at 1)

16.

As the head of Defendant's workers' compensation department, Plaintiff had

a number of responsibilities, including training and supervising employees,

including attorneys, working in that department.  (Complaint, ¶ 39; Pla. Dep.,

pp.92, 109, 208; Henson Dep., pp. 13, 74-75).

RESPONSE: Denied in part, Admit in part, Plaintiff was not "head" of the

workers' compensation department. Plaintiff was responsible for training other

employees in the workers' compensation department, including another workers'

compensation attorney. She had no authority to hire, fire or discipline any employees. (Def. Ex. 11 at 2, 6- 8)

The references that the Defendant make to Plaintiff's deposition support only the fact that Plaintiff trained individuals, not that she was head of the workers' compensation department. Gary Hays was the only person who could discipline an attorney. (Mincey Dep. at 8, lns. 24-25; 9, lns. 1-3) Vanessa was in charge of telling all new hires, including attorneys, know the firm's policies, and she made them sign something stating they have received the policies. (Mincey Dep. at 9, lns. 23-25; 10)

17.

While heading the Defendant's workers' compensation department, Plaintiff compiled an employee policy manual for Defendant, which contained various information regarding Defendant and its policies and procedures.  (Pla. Dep., pp. 92-96, 246-247; Ex. 10 to Pla. Dep.).

RESPONSE: Denied. The Plaintiff did not "compile an employee policy manual" for the Defendant. Plaintiff did compile two handbooks which were very different from the "employee policy manual." The handbook she compiled contained information like public bus routes for clients who did not have transportation, copies of certain sections of O.C.G.A 34-9 for the workers' compensation paralegals to reference if needed, and contact information for the investigators that

worked as independent contractors for the Defendant, among other things. (Def. Ex. 10) (Pla. Dep. 30 lns. 21-25; 31, lns. 1-8; 90-96)

Defendant's Employee Policy Manual was created and maintained by Vanessa Mincey. (Pla. Ex 1) ( Mincey Dep. at 11, lns. 8-23)

The Defendant is attempting to confuse the issues relating to the "Firm's Policies" by making it look like Plaintiff created/maintained the "Firm's Policies" rather than the "Handbooks," by taking things out of context or confusing the titles.

18.

In addition to maintaining an electronic version of the policies, Plaintiff also retained a hard-copy of the policies, which she kept in binders for each of the employees in the workers' compensation department.  (Pla. Dep. at 94-96, 247).

RESPONSE: Denied.  Plaintiff kept an electronic version and hard-copies of the "Handbooks" she compiled, which were very different from the "Employee Policies."  Plaintiff's Handbooks included information relating to the public bus route to the office for clients who did not have transportation, copies of certain sections O.C.G.A 34-9 for the workers' compensation paralegals to reference if needed, and contact information for the investigators that worked as independent contractors for the Defendant, among other things.  As she states in her deposition: "it was not a policy manual….I wasn't making any rules—for the staff, that I can recall, in that policy book." (Pla. Dep. at  93, ln. 24; 94, ln. 9)

19.

Plaintiff also placed icons on Defendant's computers so that employees would have a link to easily access electronic versions of the Defendant's general employee policies, as well as employee policies specific to the worker's compensation department.  (Pla. Dep., pp. 90, 96; Hays Dep., p. 167; Def.'s First Request for Admission, Nos. 11-13).

RESPONSE: Denied.  Plaintiff placed icons on the computer which were to be used as links for the two "Handbooks" she compiled and for the "Firm's Policies" a.k.a. "Employee Policies" which Gary Hay and Vanessa Mincey created, compiled, and possibly distributed to some of the employees, but not to the Plaintiff.  There was no such thing as "Defendant's general employee policies" and "employee policies specific to the workers' compensation department."  Again, Defendant is trying to confuse what actually took place with regards to the Handbooks that Plaintiff created/compiled and maintained and the Firm Policies a.k.a. Employee Policies which Gary Hays and Vanessa Mincey created and maintained. (Pla. Dep. at 91-96) (Def. Ex. 10, Ex. 11 p. 13) (Pla. Ex. 1)

20.

On September 5, 2005, Plaintiff wrote and sent an electronic message to Defendant's employees which stated:

13

Everyone, next time your sign back into needles, there will be 2 new icons on you toolbar in needles.  One icon is of a little house and one is of binoculars.  If you click on the binoculars icon, it will pull up the firm POLICIES.   If you click on the little house, it will bring up the firm's OFFICE/EMPLOYEE HANDBOOK.  <u>Everyone thoroughly read both of these items because you are required to know everything in them and also because they are extremely helpful, especially for new employees/trainees.</u>  These items will also be constantly updated as new policies/procedures are made.

WC people, you have an additional icon in needles, a little smiley face.  This is the WC handbook and you all know what it is and what is in it.

If there are any suggestions/commentaries, etc., feel free to contact me at any time.  (Def.'s First Request for Admission, No. 11) (Emphasis added.).

RESPONSE: Admit.

21.

Defendant's employee policy manual included a policy which provided:

## 11. YOUR COMPENSATION AT HAYS & MAYSILLES, P.C.

The goal of our firm it (sic) to design salary ranges that are competitive with the current market and provide rewards that recognize performance.  Jobs vary in their degree of complexity, difficulty, scope and impact on HAYS & MAYSILLES, P.C.'s financial performance results.  The compensation programs also reflect individual job performance under a number of factors including:

1.  Knowledge of job skills required for the position, special skills;

2.  Quality of work done;

14

3.  Amount of work done;

4.  Initiative and problem solving focus; and

5.  <u>Demeanor and attitude</u> – cordiality to members of the Firm, clients,

attorneys and adjustors, helpfulness, responsibility, etc.

Each employee's compensation package <u>shall be confidential</u>.

Disclosure of said information may result in disciplinary action up to and

including termination.

(Ex. 1 to Hays Dep.) (Emphasis added.).

RESPONSE: Denied in part, unknown in part. This paragraph refers to a prior

firm, Hays and Maysilles, P.C., not Gary Martin Hays and Associates, P.C. While

the "Employee Policies," allegedly contained that policy. Plaintiff never saw this

specific policy, nor read the Firm Policies. (Pla. Dep. at 91-92) At no point during

her employment was Plaintiff aware of any policy prohibiting salary discussion nor

was she aware of the firm's leave policies. (Pla. Dep. at 92, ln. 2) When Plaintiff

was hired, she was never provided with any policy manual nor ever made aware

that there was an employee policy manual. (Mincey Dep. at 19, lns. 10-17)  (Pla.

Dep. at 90, lns. 11-14).

22.

Hays & Maysilles, P.C. is Defendant's predecessor firm, which was

comprised of Mr. Hays and Duncan Maysilles.  (Hays Dep., p. 11).  After Mr.

Maysilles retired in 2000, Mr. Hays formed Gary Martin Hays & Associates, P.C.

Id.

RESPONSE: Admit.

23.

On or about June 1, 2004, Plaintiff relocated to Dallas, Texas after her husband was accepted into a surgical residency position there. (Pla. Dep., pp. 125-126; Exs. 11 and 12 to Pla. Dep., p. 1; Complaint ¶ 19).

RESPONSE: Admit. In addition, Plaintiff resigned at this time and Gary Hays urged her to stay and arranged for her to work remotely for the firm. (Hays Dep. at 270, lns. 20-25; 271, lns. 1-9)

24.

Plaintiff continued working for the Defendant from her home office after she relocated to Texas. (Pla. Dep., p. 127; Def.'s First Request for Admission, No. 155).

RESPONSE: Admit.

25.

Defendant purchased a computer so that Plaintiff could access Defendant's computer systems. (Pla. Def., p. 127; Def.'s First Request for Admission, No. 160).

16

RESPONSE: Denied, Plaintiff believes that the computer that she had in Dallas was already present in the Atlanta office and it was shipped to her. (Pla. Ex. 60, ¶ 73) There is nothing in Plaintiff's deposition on page 127 which supports the proposition that Defendant purchased a computer for Plaintiff. Nor is there anything in Defendant's First Request to Admit No. 160 which says anything specifically about a computer being purchased. Plaintiff does admit that Defendant did pay for her Internet access and for her telephone. Plaintiff bought her own desk and desk chair and used her own fax machine and scanner. (Pla. Ex. 60 ¶ 74)

26.

In addition, Defendant paid for an internet telephone and service, which connected Plaintiff to Defendant's phone systems. (Pla. Dep., p. 127; Def.'s First Request for Admission, No. 160).

RESPONSE: Admit in part and deny in part. Plaintiff denies the words "In addition" as it qualifies the rest of the sentence since Plaintiff denied Paragraph 25.

27.

Further, Defendant hired and paid another attorney, whose responsibilities included handling Plaintiff's in-person legal proceedings that she could not attend because she lived in Texas, such as depositions, mediations and hearings. (Pla. Dep., pp. 130-131).

17

RESPONSE: Admit in part, denied in part.  Defendant hired another attorney, Eric Ripper, partly because there was a need in the personal injury department for another attorney because of the volume of personal injury cases, and partly so that Mr. Ripper could cover the in-person legal proceedings which Plaintiff could not attend. (Pla. Dep. at 130, lns. 12-22)

28.

Plaintiff actually referred Eric Ripper, the attorney hired by Defendant to assume Plaintiff's in-person legal proceedings.  (Exs. 11, pp. 2-3 and 12, p. 3 to Pla. Dep.).

RESPONSE: Admit in part, deny in part.  Plaintiff did recommend Eric Ripper for a position with the Defendant when she gave her notice of resignation to the Defendant after discovering she was moving to Texas.  At this time, Plaintiff recommended Eric Ripper for the position for which Gary Hays needed an attorney: a personal injury department associate. Eric Ripper only had personal injury experience. (Pla. Dep. at 139, lns. 15-22; 258, lns. 1-8).

29.

Plaintiff provided Mr. Hays with the names of three other attorneys and a paralegal who were all looking for jobs, all of whom were ultimately hired by Defendant during Plaintiff's tenure with the firm, with the exception of one of the attorneys.  (Exs. 11, pp. 2-3 and 12, p. 3 to Pla. Dep.).

RESPONSE: Admit in part, deny in part.  Plaintiff passed along the names of the

following individuals after each of those individuals, with the exception of Kellie

Henson and Sandy Bowers, requested that Plaintiff mention them to Gary Hays for

potential employment: Eric Ripper, Esq., Kellie Henson, Esq., Seth Bader, Esq.,

Michael Friedman, Esq., Deborah Harris, Esq., Jackie Piland, Esq. and Sandy

Bowers, paralegal.  Sandy Bowers contacted and interviewed with Plaintiff's

father's law firm and that is how Plaintiff got Sandy Bowers' name.  Kellie Henson

was referred to Plaintiff by Michael Usry, Esq. after he learned that Gary Hays was

looking for another workers' compensation associate.  Of the individuals whose

names Plaintiff passed along to Gary Hays, Eric Ripper, Kellie Henson, Jackie

Piland, and Sandy Bowers were hired. (Pla. Ex. 60, ¶ 76) (Def. Ex. 11, at 2) (Pla.

Dep. at 131, lns. 8-11)

30.

Defendant subsequently hired another full-time attorney for its workers'

compensation department who assumed responsibility for handling Plaintiff's in-

person proceedings.  (Pla. Dep., p. 131; Henson Dep., p. 88).

RESPONSE: Admit in part, deny in part.  Kellie Henson was hired by Gary Hays

as a workers' compensation associate attorney in February, 2005. She had never

handled workers' compensation cases. (Henson Dep. at 14-17) After being hired,

Ms. Henson learned that she would be responsible for attending the in-person legal

19

proceedings which Plaintiff could not attend. Henson was not fully trained in handling workers' compensation claims until approximately August or September, 2005, and began handling her own case load around that time. (Henson Dep. at 26, ln. 11; 27, ln. 8)  Beginning around October, 2005, Plaintiff was responsible for covering all of her own in-person legal proceedings. (Pla. Dep. at 131, lns. 8-11) (Def. Ex. 5-6)

31.

On or about September 23, 2005, Plaintiff received a written reprimand from Mr. Hays regarding her treatment of Mr. Hays and other Defendant's employees. (Pla. Dep., p. 152; Ex. 4 to Pla. Dep.; Ex. 1 to Hays Dep.).

RESPONSE: Denied. Plaintiff did receive an email from Hays on that date that was critical of her. However, Hays testified that Plaintiff was never given a "write up" as defined by the Firm's Policies. (Hays Dep. at 293, lns. 2-11) Later, he told Plaintiff that he did not mean what he said in the "reprimand" and that things were patched up. (Pla. Dep. at 158, lns. 1-8; 165, lns. 5-15; 172, lns. 16-25; 173) (Pla. Ex. 60 ¶¶ 15-17)

Gary Hays further told Plaintiff that the reason he wrote that reprimand on 9/23/05 was due to a stressful time with his wife with regards to the in vitro fertilization process and he took his anger out on Plaintiff. (Hays Dep. at 69, lns. 23-25; 70, lns. 1-9; 165, lns. 5-15; 237, lns. 20, 21, 25) (Pla. Dep. at 158, lns. 1-8;

172, lns. 16-25; 173) (S. Hays Dep. at 27, lns. 13-26; 84, lns. 7-19) (Pla. Ex. 60 ¶¶ 15-17)

32.

Plaintiff was reprimanded after she referred to Mr. Hays as incompetent because of the way he handled a matter.  (Pla. Dep., pp. 153-154; Ex. 4 to Pla. Dep.).

RESPONSE: Denied.  Plaintiff never referred to Mr. Hays as incompetent. Plaintiff was specifically asked how a mistake occurred when Exhibits were not attached to a Motion which had been filed with a Court within a designated time-frame, and Plaintiff responded truthfully that whoever the attorney was who signed the motion, whose role it was to also check to make sure all the enclosures cited at the bottom of page on the enclosure line were attached or that all the exhibits cited in the certificate of service were attached to the Motion, was not competent in checking for the attachments.  (Pla. Dep. at 115, lns. 11-15; 154, lns. 1-3; 156, lns. 8-18, 158, lns. 12-23) Plaintiff did not believe that Gary Hays signed the Motion which went out without its Exhibits.  Gary Hays testified at his deposition that Plaintiff called whoever signed off on her document incompetent, and he stated that he was not sure if it was him or Kellie.  (Hays Dep. at 125, lns. 7-19; 127, 128, lns. 1-5) Gary Hays testified in his deposition that if an employee was acting incompetently, he would want to be notified of such incompetence; Plaintiff was

notifying Gary Hays of actions she felt were incompetent which she believed, and

still believes, had been performed by Kellie Henson.  (Hays Dep. at 134, lns. 18-

20) (Pla. Dep. at 153, ln 9; 154, lns. 1-3) (Henson Dep. at. 66, lns. 18-25; 67; 68,

lns. 1-2)

33.

Plaintiff knew from the reprimand that Mr. Hays was unhappy with her

reference to him as being incompetent.  (Pla. Dep., p. 154).

RESPONSE: Denied.  Plaintiff never referred to Mr. Hays as being incompetent.

Plaintiff did not believe that Gary Hays signed the motion which went out without

its exhibits. See response to paragraph 32. In addition, he later told plaintiff that he

did not mean what he said in the "reprimand" and that things were patched up.

(Pla. Dep. at 158, lns. 1-8; 165, lns. 5-15; 172, lns. 16-25; 173) (Pla. Ex. 60 ¶¶ 15-

17)

Hays further told Ms. Wolchok that the reason he wrote that reprimand on

9/23/05 was because he was going through a stressful time with his wife with

regards to the in vitro fertilization process and he took his anger out on Plaintiff.

(Hays Dep. at 69, lns. 23-25; 70, lns. 1-9; 237, lns. 20- 25; 165, lns. 5-15) (Pla.

Dep. at 172, lns. 16-25; 158, lns. 1-8; 173) (S. Hays Dep. at 27, lns. 13-26; 84, lns.

7-9, 14-19) (Pla. Ex. 60 ¶¶ 15-17)

35.

Plaintiff admits that she "didn't have time" to say "thank you" and "please," and "may have come across harsh" to people.  (Pla. Def., pp. 114, 167-168, 170).

RESPONSE: Denied. This sentence takes Plaintiff's testimony out of context. On page 114, she testified that she explained to a new case manager, Josue Rivas, that on e/pops (an internal instant messenger) **they** often draft them while they are on the phone and that "**we** don't have time for pleasantries….it has nothing to do with who is on the receiving end." (emphasis added)  She further explained to Rivas that "just because of the nature of a litigation environment, there are times that you need something in a hurry or that you're juggling a lot of things or you're in the middle of, you know, of a legal proceeding conference with a judge and you need a document brought into your office immediately, so that you can properly cite the document….. It's the nature of litigation..." This statement was not limited to Plaintiff's practice but that it was the nature of the environment.

Then, on page 167, lines 18-23, Plaintiff explained she was doing an "obscene amount of work. And with that comes along less time for pleasantries as far as thank you, please those types of things." Also, Plaintiff was in Dallas and did not have face-to-face contact with employees. "And e/pops can't convey tone….So it is definitely possible that people thought that [she] may have been coming across harsh and that wasn't [her] intention." (Pla. Dep. at 168, lns. 4-11) While she felt

she had acted the same from "day one," when Defendant asked her to treat office employees more courteously, she agreed to pay closer attention to it and whatever she could to make Mr. Hays happy.  (Pla. Dep. at 162, lns. 14-18; 167, lns. 12-13;)

April Ruff, who reported to Plaintiff, testified that Plaintiff did not treat her or anyone else she was aware of disrespectfully. Others thought she was "stern," but Ruff did not agree with that assessment. Plaintiff was not someone who chit-chatted and was all business because work needed to be done. Plaintiff's demeanor did not change. Ruff felt Plaintiff was patient with her while she was learning her job. (Ruff Dep. at 14-16)

36.

Mr. Hays advised his wife that Plaintiff was disrespecting his staff, and that he was not happy with Plaintiff referring to them as "stupid" and "idiot."  (S. Hays Dep., pp. 48-49).

RESPONSE: Denied. While Hays may have told his wife this, Plaintiff never referred to anyone as stupid or an idiot. (Pla. Dep. at 164, lns. 18-25)

37.

Mr. Hays also told his wife that he was upset about an incident wherein Plaintiff yelled at a paralegal whose daughter was diagnosed with sickle cell anemia, after the paralegal made a mistake.  (S. Hays Dep., p. 48).

RESPONSE: Denied, while Hays may have told his wife that, Plaintiff denies she yelled at Margo Brown; the only contact Plaintiff had with Margo Brown was written communication via epop or needles message.  (Hays Dep. at 141, lns. 15-25; 142, lns. 1-21; 143; 144, lns. 1-22) Plaintiff had no knowledge at the time about the employee's daughter's situation, nor was that ever brought to her attention. (Pla. Ex. 60, ¶ 77)

38.

Plaintiff understood Mr. Hays's comment, "[i]f you ever disrespect me like you did this morning, I'll fire you on the spot," to be a warning.  (Pla. Dep., p. 172).

RESPONSE: Admit in part, deny in part.  While at the time it was given, Plaintiff considered this to be a warning, later Gary Hays retracted his warning. Plaintiff called him because she had never had something like this happen before. Hays told her that he and his wife were going through in vitro fertilization. He explained that he was very worked up about that and he took a lot of his anger out on her and he apologized. (Pla. Dep. at 157 ln. 23; 158, ln. 8; 172, lns. 13-25) (S. Hays Dep. at 27)

39.

On or about September 27, 2005, Mr. Hays provided Plaintiff further explanation regarding information contained in his September 23, 2005 reprimand,

as well as other matters discussed with Plaintiff.  (Pla. Dep., p. 183; Ex. 6 to Pla. Dep.).

RESPONSE: Plaintiff admits that on September 27, 2005, Plaintiff received a follow up email to the September 23, 2005, but denies that the September 23, 2005 email was a reprimand. Hays testified that Plaintiff was never given a "write up" as defined by the Firm's Policies." (Hays Dep. at 293, lns. 2-11) See Plaintiff's Responses to paragraphs 31-34, 38.

40.

Although Plaintiff was disappointed about some aspects of Mr. Hays's September 27, 2005 memo, she felt Mr. Hays was being reasonable and fair.  (Pla. Dep., pp. 183-186).

RESPONSE: Denied.  Plaintiff's testimony is taken out of context. Plaintiff testified that she was disappointed with the adjustments in her salary and the fact that she would have to pay her own expenses to come to Atlanta, because that was a change. However, she said she wouldn't use the term unfair. "[A]fter all, he was the boss. He decided what the situation [was] going to be." Thus, he had the right to make the changes he wanted. (Pla. Dep. at 184, lns. 22-25) Plaintiff also testified that she was alarmed and wanted to work out the issues so that Hays was happy with her (Pla. Dep. at 188, lns. 12-16)

41.

On or about January 30, 2006, Plaintiff was again reprimanded by Mr. Hays as a result of how she spoke to Mr. Hays in response to a work issue.  (Pla. Dep. 112-113, 189; Ex. 7 to Pla. Dep.).

RESPONSE: Deny. Plaintiff admits that Hays reprimanded her, but denies she engaged in the conduct alleged. At the time she told him she was being reprimanded unfairly. She "did not raise her voice to him in this e-mail or on the phone or anywhere else." (Pla. Dep. at 190- 191)

42.

Mr. Hays warned Plaintiff not to "ever raise [her] voice like that to [him] again."  (Ex. 7 to Pla. Dep.).

RESPONSE: Admit in part, denied in part.  Plaintiff admits that the email says this, but denied that she engaged in the conduct alleged. (Pla. Dep. at 190, lns. 4-5, ln. 22; 191, lns. 1-2)

43.

Plaintiff became pregnant in October 2005.  (Pla. Dep., p. 148).  In or about February 2006, Plaintiff advised Mr. Hays that she was pregnant.  (Complaint, ¶ 30; Ex. 8 to Pla. Dep.; Hays Dep., pp. 179-180).

RESPONSE: Admit in part, denied in part.  Plaintiff did become pregnant in October, 2005, however, Plaintiff informed Mr. Hays about her pregnancy earlier

27

than February, 2006. On January 17, 2006, Plaintiff sent Hays an email: "I really wish we could get back to the way things used to be between you and me- we used to have a great relationship- and I do not know what happened to it" to which Hays responded that things had not soured. (Def. Ex. 14) Plaintiff testified that by this time he knew she was pregnant. On January 17, 2006, Hays send around a health questionnaire for the employees to complete in order to get health insurance quotes. At that time, she called him and told him she had a problem answering the question whether she was pregnant because that was personal information. (Pla. Dep. at  58, lns. 6-25; 276, ln. 25; 277; 278, lns. 1-5) Plaintiff's Exhibit 32 is the completed form. Even though Plaintiff was sure Hays had figured out she was pregnant, after that conversation, Plaintiff finally told Hays that she was pregnant. (Pla. Ex. 60, ¶¶ 21-36)

44.

Plaintiff advised Mr. Hays that she planned to hire a nanny to care for her child so that she could continue working.  (Pla. Dep., p. 150).

RESPONSE: Admit.

45.

Plaintiff felt Mr. Hays displayed an okay reaction in response to her comment about child care.  (Pla. Dep., p. 150).

RESPONSE: Denied. Plaintiff testified his reaction was "Just okay." (Pla. Dep. at 150, ln. 23) She also testified that Hays told her that it would be difficult for her to continue to work for him in her apartment once the baby is present. (Pla. Dep. at 283, lns. 2-4)

46.

When Mr. Hays told his wife that Plaintiff was pregnant, he had a big smile on his face. (S. Hays Dep., p. 29).

RESPONSE: Plaintiff cannot admit or deny this statement, however it is immaterial to any issue in the case.

47.

Mrs. Hays further testified that she and Mr. Hays were very happy for Plaintiff and her husband. (S. Hays Dep., p. 29).

RESPONSE: Plaintiff admits that is Sheri Hays's testimony. She can neither admit nor deny that it is true and denies that it is material.

48.

On March 21, 2006, during a conversation between Plaintiff and Ms. Henson, a discussion regarding Ms. Henson's compensation ensued. (Pla. Dep., pp. 206-208; Henson Dep., pp. 85-87, 91-95).

RESPONSE: Admit.

49.

Immediately thereafter, Plaintiff called Mr. Hays on his cellular phone to discuss the information that she had obtained from Mrs. Henson.  (Pla. Dep., pp. 208-209; Hays Dep., 156-157, 159, 161).

RESPONSE: Admit.

50.

Mr. Hays was very upset by his conversation with Plaintiff.  (S. Hays Dep., pp. 33, 37-38).

RESPONSE: Plaintiff can neither admit nor deny this statement. Hays did not act upset during the conversation. However, Plaintiff admits that Henson called her right after Plaintiff's conversation with Hays and told her that Hays had "reamed out" Henson about discussing salary. (Pla. Dep. at. 209, lns. 19-20) To the extent that Hays was upset, Plaintiff denies she engaged in any conduct that would have resulted in his being upset. (Pla. Ex. 60, ¶¶ 49-50)

51.

Mr. Hays told his wife, who was present when Plaintiff called, that Plaintiff had obtained information regard employees' salaries, including someone who had been interviewed by Defendant but was not hired.  (S. Hays Dep., pp. 32, 39-41).

RESPONSE: Denied. Hays may have told his wife this and Plaintiff admits Henson voluntarily revealed her salary but plaintiff did not seek out this information. Plaintiff denies that she had obtained information regarding someone who had been interviewed by Defendant but was not hired or that she told him that she had. (Pla. Dep. at 208-210; 256, lns. 6-11) (Hays Dep. at 161, lns. 21-22) Sheri Hays was present when Gary Hays received the call from Plaintiff, however, while Sheri Hays testified she heard the call, Gary Hays testified that she initially was present but that he told her to go on into the restaurant and she did not remain present during the entire call (Hays Dep. at 160, lns. 6-16)

52.

Mr. Hays told his wife that Plaintiff was demanding more compensation and "he felt backed into a wall." (S. Hays Dep., pp. 33-34, 39).

RESPONSE: Denied, Gary Hays may have told his wife that Plaintiff was demanding more compensation, however, she did not demand more compensation, she told Hays that Henson had "disclosed to [her] out of the blue that she got a raise…I was in shock that…her salary was higher than what our arrangement was," at which point Hays cut her off, told her he couldn't talk about it right then and they he'd talk to her the next day (Pla. Dep. at 209, lns. 3-15)

53.

In addition, Mr. Hays told his wife that he felt Plaintiff's behavior and the manner in which she spoke him was disrespectful.  (S. Hays Dep., pp. 33-34, 37-38).

RESPONSE: Plaintiff does not know what Hays told his wife, however, Plaintiff denies that she acted in a disrespectful manner (Pla. Dep. at 209, lns. 3-14) (Pla. Ex. 60, ¶¶ 48-49)

54.

According to Mrs. Hays, Mr. Hays was visibly upset and expressed concern about Plaintiff's continued disrespect of him and violation of Defendant's policies, setting a poor precedent for the other employees.  (S. Hays Dep., p. 94; Hays Dep., pp. 157-158).

RESPONSE: Plaintiff cannot admit or deny this statement; however, she denies that she was disrespectful, that she violated Defendant's policies or set a poor precedent for the other employees. (Pla. Ex. 60, ¶¶48-49)

55.

Mr. Hays also had a conversation with Ms. Henson regarding the matter and Ms. Henson advised him that the Plaintiff had attempted to compel her to disclose

her salary, which she believed should be held confidentially.  (Henson Dep., p. 94; Hays Dep., pp. 157-158).

RESPONSE: Denied. Plaintiff was not privy to Henson's conversation with Hays, however, Henson told Plaintiff that she was "not going to lose her job. [she's] prepared to lie on this subject matter, so I am going to tell [Hays] that [Plaintiff] initiated the conversation." (Pla. Dep. at 209, ln. 17; 210, ln. 5)  Plaintiff never attempted to compel Ms. Henson to reveal her salary or anything regarding salary. The following day, Plaintiff told Hays that Henson had said she was going to lie about it, but Hays ignored it. (Pla. Dep. at 223, ln. 20; 224, ln. 2)

56.

After his conversations with Plaintiff and Ms. Henson, Mr. Hays contacted a family friend, who also manages a law firm, and one of his business partners to discuss his conversations with Plaintiff and Ms. Henson.  (Griffin Decl., ¶¶ 8-17; Milam Decl., ¶¶ 3-9).

RESPONSE: Denied. Gary Hays testified that other than his wife, he only spoke to Derek Hays and Philip Milam about Plaintiff the night before her termination. He did not testify that he spoke to Richard Griffin about plaintiff. He testified he spoke to Kellie Henson, Derek Hays and Philip Milam. (Hays Dep. at 157, lns. 21-15; 162, lns. 11-13) In addition, Sheri Hays testified that he did not make any phone calls during dinner after he had talked to Plaintiff and Kellie Henson. (S. Hays

Dep. at 39-41) Defendant's Initial Disclosures do not identify Richard Griffin as a witness. (Pl. Ex. 64, Attachment A) In addition, even though the Defendant's Second Supplemental Responses to Initial Disclosures, filed as discovery was closing, identified Griffin as a witness, the only area of knowledge was identified was "relating to Defendant's business practices and Plaintiff's reputation." (Pl. Ex. 65, Attachment A, at 4)

57.

The following day, on March 22, 2006, Mr. Hays met with his Office Manager and advised her about his prior conversation with Plaintiff and advised her that he was not happy with what had happened the previous evening.  (Mincey Dep., pp. 111-113).

RESPONSE: Denied. Hays states he recalls telling her "just about the phone call that [he] had with Susan and the phone call [he] had with Kellie. (Hays Dep. at 165, lns. 3-24)

58.

Thereafter, Mr. Hays and his Office Manager met with Plaintiff.  (Pla. Dep., 219; Hays Dep., 146-153; Mincey Dep., pp.113-117).

RESPONSE: Admit in part, deny in part. Plaintiff admits that she met with Hays and the office manager, but denies the substance of the conversation referred to in paragraph 57.

34

59.

Mr. Hays was upset by Plaintiff's conduct during their meeting.  (Hays Dep.,

pp. 147-153).

RESPONSE: Denied.  Plaintiff was polite and very respectful at all times during

the meeting she was summoned to by Gary Hays in which Vanessa Mincey was

also present. She was not disrespectful to Gary Hays on the date that she was

terminated; to the contrary, Plaintiff was desperately trying to save her job and was

extremely polite and courteous to Gary Hays at all times. (Pla. Dep. at 208, lns. 17-

25; 209, lns. 1-15; 219, lns. 24-25; 220; 221, ln. 25; 222, lns. 1-2; 223; 224, lns. 1-

12)

60.

Ms. Mincey was "flabbergasted" and "in awe" by Plaintiff's behavior during

their meeting.  (Mincey Dep., pp. 116-117).

RESPONSE: Denied. While Mincey used these words in her deposition, she also

described Plaintiff as being "a little bit animated in both her mannerisms as well as

her speaking tone of voice." Plaintiff denies that she engaged in any behavior that

would result in Mincey being flabbergasted and in awe. (Mincey Dep. at 116, lns.

15-18) (Pla. Dep. at 219-224)

61.

Mr. Hays and Ms. Mincey also met with Ms. Henson to obtain further information and clarification regarding Ms. Henson's and Plaintiff's prior conversation regarding Ms. Henson's compensation.  (Hays Dep., pp. 154, 157; Mincey Dep., pp. 119-120; Henson Dep., pp. 101-102).

RESPONSE: Plaintiff can neither admit nor deny this statement, however, any conversation with Henson would had to have been before Plaintiff met with defendant on March 22, 2006, because there was only about a ten minute break between her meeting with Hays and then being called back in to be fired. (Pla. Dep. at 223). Mincey and Hays's testimony contradict each other. Hays testified he talked to Henson in the morning before meeting with Plaintiff. Mincey says she and Hays met with Henson after Plaintiff's first meeting with them and before the termination meeting. (Hays Dep. at 154; 157) (Mincey Dep. at 119-120) Henson testified the meeting was in the morning and lasted "maybe three minutes." (Henson Dep. at 101, lns. 21-22)

62.

Ms. Henson reiterated that Plaintiff had asked her to disclose her salary and that she felt uncomfortable about the conversation.  (Henson Dep., pp. 101-102).

RESPONSE: Denied. Henson testified that she told Gary Hays that Plaintiff made her feel uncomfortable; however, Plaintiff denies she did anything to make Henson feel uncomfortable. In addition, Henson told Plaintiff immediately after talking to

36

Gary Hays that she was prepared to lie to save her job. (Pla. Dep. at 209, ln. 17; 210, ln. 5)

63.

In addition, Mr. Hays and Ms. Mincey met with the partners in Defendant's firm, as well as another associate attorney, regarding Plaintiff. (Hays Dep., pp. 148-149, 152, 154-157; Mincey Dep., 118-119, 121; Milam Decl., ¶¶ 10-11).

RESPONSE: Deny in part, unknown in part. There was only one partner, Derek Hays, at the time. There were two other associate attorneys, Philip Milam and Eric Ripper aside from Ms. Henson. Philip Milam did not become a partner until after Plaintiff was fired, sometime in 2006. (Hays Dep. at 14, lns. 9-12; 41, lns. 19-22)

64.

Mr. Hays terminated Plaintiff on March 22, 2006 because he believed Plaintiff had, among other things, attempted to compel her subordinate, Ms. Henson, to disclose her salary, attempted to use salary information of other individuals to force him to giver her a pay increase, and continued to disrespect him. (Pla. Dep., p. 224; Hays Dep., pp. 144-146, 152; Mincey Dep., pp. 70-72, 122-123; S. Hays Dep., pp. 31-34, 39-41).

RESPONSE: Denied, Mr. Hays fired Plaintiff because she was pregnant and to avoid paying her health insurance and other benefits and used a pre-textual reason

to justify the decision. The following supports Plaintiff's assertion that the reason give for her termination is pre-textual.

At the time of her termination, the sole reason given for the termination is that Plaintiff "violated defendant's policy as it relates to disclosure of employee salaries and compensation." (Pla. Ex. 16) At the time of her termination, no other reason was given to her verbally or on her separation notice. Hays also told her she was never going to get unemployment because she was not ready and willing to work in the state of Georgia. (Pla. Dep. at 224, ln. 22; 225, ln. 1)

When Plaintiff filed for unemployment compensation, Defendant gave additional reasons for her termination claiming that Plaintiff was insubordinate, created a hostile work environment, changed and/or modified policies and procedure without prior consent or approval of management and gave twelve dates of alleged infractions. (Pla. Ex. 25) (The memo attached also contradicts Gary Hays, Vanessa Mincey and Kellie Henson's testimony regarding the conversation Plaintiff had with Henson.) In his deposition, Hays could not explain the alleged policy violations or to what the dates referred. (Hays Dep. at 222, ln. 24; 223, ln. 4). Hays also admits to having employees go back and collect evidence to support Plaintiff's termination. (Hays Dep. at 220, lns. 22-25; 221, lns. 1-4)

Then in litigation, the Defendant claimed that Plaintiff was terminated for treating Gary Hays and her co-workers abrasively, allegedly referring to Hays as

"incompetent," speaking to him in condescending and patronizing tones and calling the support staff "incompetent" and "retarded;" for using her position in an abusive manner to compel a subordinate to communicate regarding a matter that the subordinate felt should be held confidentially and for acting unprofessional on the day of her termination. (Pla. Ex. 64, at 3)

Hays testified that Henson told him that Plaintiff was "in her face to find out what she was making" and was standing over Henson's desk. (Hays Dep. at 145, ln. 21; 151, lns. 13-23) Henson denied that Plaintiff was in her face and did not tell Gary Hays that she was. (Henson Dep. at 149, lns. 23-24; 150, lns. 8-10)

Hays claims to have reprimanded Kellie Henson for discussing salary with plaintiff: " told her it shouldn't have happened. But I understand under the circumstances with Susan being her supervising attorney, how she felt compelled to do it. But I told her don't do it again." (Hays Dep. at 275, lns. 11-19) Henson, however, testified differently: " Q. Were you given any kind of discipline for talking about salaries with Ms. Wolchok? A. No."  (Henson Dep. at 105, ln. 25; 106, ln. 2)

Hays hired Plaintiff's replacement before Plaintiff's termination, which is evidence that he was planning on Plaintiff not remaining employed with him. (Hays Dep. at 273, ln. 20- 275, ln. 3)

All the associate attorneys except for Plaintiff were given raises in February, 2006, about a month before Plaintiff's termination. (Hays Dep. at 170-178) (Pla. Ex. 10-12) New hire, Jackie Piland, had a starting salary hirer than Plaintiff's. (Pla. Ex. 53)

65.

Since Defendant's inception in 1993, fifteen (15) female employees have become pregnant.  (Hays Decl., ¶ 16).

RESPONSE: The Defendant is Law Offices of Gary Martin Hays and Associates, PC, which was formed in 2000. Prior to that time, Gary Hays was a member of another firm, Hays and Maysilles. (Hays Dep. at 11) Plaintiff does not deny that there have been 15 female employees who have become pregnant, however, not all of them became pregnant after Hays started his own firm and prior to Plaintiff's termination. (Hays Dep. at 49-53.) (Pla. Ex. 66; Ex. 68, ¶¶ 8-10)

The following employees' pregnancies were made known after Plaintiff's termination: (Pla. Ex. 68 ¶¶ 8-10) Elica Fuentes, Simone Moore, Hayley Sheline, Dina Vasco-Posada, Jennie Fizer.

Nancy Hays was Derek Hays's wife. Derek Hays is Gary Hays's brother and law partner. Nancy Hays last worked for the Defendant prior to September, 2000. (S. Hays Dep. at 59, lns. 9-18)

Lisa Swain is a family friend who worked for defendant prior to September 2000 and if she was pregnant during her employment, it would have been prior to that time. (S. Hays Dep. at 53, lns. 3-8; 60, lns. 17-25; 61, lns. 1-2)

Stephanie Penland started her employment during or before the quarter ending 9/30/2000 and her employment ended during the quarter ending 9/30/2000. (Pla. Ex. 63, Ex. 68 ¶¶ 8-9)

Janet McQueen has been identified as becoming pregnant during her employment, however, Defendant's quarterly reports to the Georgia Department of Labor do not identify her as having been employed from September, 2000, to and through December, 2006, so her employment must have pre-dated September, 2000. (Pla. Ex. 63, Ex. 68 ¶¶ 8-9)

Sia Amadu was pregnant in 2000. After she revealed her pregnancy, the firm's attitude toward her changed. For example, more than once when she got her bonus check it did not appear to be correct. When she asked Derek Hays about it he told her "it is what it is," and did not address her concerns. In late 2002 or early 2003 she wrote Gary Hays a letter complaining that she had not gotten a raise since her raise at the end of her initial probationary period. After she sent the letter, her supervising attorney, Amy Smith, told her that Hays had said if she asked for a raise again she'd be fired. (Pla. Ex. 67)

Gary Hays planned on firing Sia Amadu because she was pregnant, and expressed those intentions to Amy Smith, Esq., an associate attorney with the Defendant. (Pla. Dep. at 20, lns. 1-14) (Smith Dep. at 13, lns. 4-16; 14, lns. 2-5, 13-25; 15, lns. 22-25; 16, lns. 1-9; 44, lns. 12-25; 45) (Pla. Ex. 34)

Gary Hays and Derek Hays told associate attorney Amy Smith that they were not happy with the fact that Sia Amadu pregnancy was out of wedlock. (Pla. Dep. at 20, lns. 1-14) (Smith Dep. at 13, lns. 4-16; 14; 15, lns. 22-25; 16, lns. 1-9; 44, lns. 12-25; 45) (Pla. Ex. 34)

Derek Hays stated that it was people like her (Sia Amadu) that makes the Defendant's insurance premiums go up. (Smith Dep. at 13, lns. 4-16; 14, lns. 2-5, 13-25; 15, lns. 22-25; 16, lns. 1-9; 44, lns. 12-25; 45)

66.

Of the fifteen (15) female employees who have become pregnant, ten (10) returned to work after having their babies. (Hays Decl., ¶ 17).

RESPONSE: Denied. See response to ¶ 65 above. Most of these employees became pregnant and took leave after plaintiff's termination.

67.

Of the fifteen female (15) employees who have become pregnant, two (2) elected not to return to work after having their babies and voluntarily resigned. (Hays Decl., ¶ 18).

42

RESPONSE: Denied. As Defendant does not identify who these persons are,

Plaintiff cannot determine to whom this refers. The only person who did not return

from maternity leave during Plaintiff's employment was April Ruff, who was fired.

(Ruff Dep. at 103, lns. 24-25; 104, lns. 1-13)

68.

Of the fifteen female (15) employees who have become pregnant, one (1)

did not return to work because she wanted to extend her leave of absence for

reasons unrelated to her pregnancy and/or her physical condition.  (Hays Decl., ¶

19).

RESPONSE: Denied. April Ruff was terminated because she was pregnant and had

taken leave for child birth and pregnancy related reasons. (Ruff Dep. at 51, lns. 10-

18) (Pla. Dep. at 180, lns. 8-13) (Mincey Dep. at 42, lns. 7-17) (Pla. Ex. 3) Hays

discussed his plans on terminating April Ruff with Wolchok, and specifically

stated that he did not want to pay Ms. Ruff's health insurance benefits. (Pla. Dep.

at 180, lns. 8-13; 267, lns. 22-25; 268; 270, lns. 7-20)

On July 20, 2005, Ruff was admitted to the hospital due to pregnancy

complications. On July 25, labor was induced and Ruff gave birth to a three pound

baby, who was admitted to Neonatal Intensive Care. (Ruff Dep. at 34, lns. 14-25)

Ruff let Defendant know that she would be beginning her maternity leave and

Mincey sent her leave papers to complete (Pla. Ex. 2)

Under the leave policy, Ruff was entitled to leave at least until September 6, 2005 and extensions were possible. (Pla. Ex. 1-2) In addition, Ruff had accrued 13.5 hours of personal leave and 30 vacation hours, which would have allowed her to stay out of work one more week, until September 13, 2005. (Ruff Dep. at 26, ln. 17-20)  As allowed by Defendant's policies, Ruff submitted a request for an extension of her leave through September 30, 2005. (Pla. Ex. 2)

On September 9, 2005, without having told Ruff whether her leave extension had been granted or not, the Defendant fired Ruff allegedly for failing to return to work from leave. (Pla. Ex. 47) (Hays at 55, lns. 6-19; 60, lns. 2-18) (Mincey Dep. at 37, lns. 8-21; 42, lns. 2-24) The letter sent to Ruff stated that the firm had had to fill her position, even though Mincey testified that Ruff was not replaced.[2] (Pla. Ex. 17) (Mincey Dep. at 42, ln. 25; 26 lns. 1-7).

Another employee, Chez Chapman was allowed to stay on sick leave as a result of her having cancer, for an extended period of time, at least from December 14, 2004, through March, 2005. (Pla. Ex. 54)

Vanessa Mincey also discussed with Plaintiff Gary Hays's plans for terminating April Ruff because of pregnancy, maternity leave, and health insurance

---

[2] Ruff filed an EEOC charge claiming pregnancy discrimination. Plaintiff was never told of this charge despite Ruff having been Plaintiff's case manager. (Pla. Dep. at 29, lns. 22-25; 30, lns. 1-5).

with Ms. Wolchok. (Pla. Dep. at 267, lns. 22-25; 268, lns. 1-3, 13-24; 270, lns. 7-20)

Wolchok informed both Gary Hays and Vanessa Mincey that she did not agree with Gary Hays's intentions of firing April Ruff or the reason she was to be fired. (Pla. Dep. at 143, lns. 1-3; 271, lns. 17-25; 272, lns. 1-5)

69.

Since Defendant's inception in 1993, only two (2) female employees have been pregnant at the time they were terminated, Plaintiff and Jennifer Williams ("Ms. Williams"). (Hays Decl., ¶ 20).

RESPONSE: Plaintiff can neither admit nor deny that she and Williams were the only ones terminated while pregnant, however she admits that both she and Williams were pregnant when fired. Evidence supports a conclusion that both Plaintiff and Williams were fired because of their pregnancies.

Williams felt that Gary Hays's attitude towards her changed after her pregnancy disclosure (Williams Dep. at 24; 26, ln. 1) Hays made sexual jokes about Williams's pregnancy to her and in the presence of others. (Williams Dep. at 19, lns. 1-19) By time of her termination at 34 weeks pregnant, no one had ever asked her about her maternity leave. (Williams Dep. at 26, lns. 10-14) Williams was never reprimanded before being fired. (Williams Dep. at 11- 12) Williams was told she was being fired for letting a family member use an office form in regards

45

to the family's member's own auto accident claim. Before giving the form to her

family member, she got permission from her supervisor, Derek Hays, and did not

violate firm policies. (Williams Dep. at 34-37)

70.

Prior to Ms. Williams' termination, Defendant had terminated a male

employee for the unauthorized use of the Defendant's resources.  (Hays Decl., ¶

22).

RESPONSE: Denied. It is Plaintiff's understanding that Matthew Belflower, the

employee mentioned above, was fired for spending time at work writing a love

letter at work. (Pla. Dep. at 10) (Pla. Ex. 5)

Respectfully submitted this 28th day of February , 2008.

> _s/Janet E. Hill, Esq._____
> Janet E. Hill, Esq.
> Georgia Bar No. 354230
> Attorney for Plaintiff
> HILL & ASSOCIATES, P.C.
> 1160 S. Milledge Ave, Suite 140
> Athens, Georgia 30605
> Telephone: (706) 353-7272
> Fax: (706) 549-8446
> E-mail: janetehill@bellsouth.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **SUSAN WOLCHOK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.:** |
| | ) | **1:07-CV-765-CC** |
| **LAW OFFICES OF** | ) | |
| **GARY MARTIN HAYS &** | ) | |
| **ASSOCIATES, P.C.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**RULE 7.1D CERTIFICATION
AND CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was prepared in Times New Roman, 14 point font, and is in compliance with NDGa Local Rules 5.1B and 5.1C.

I hereby certify that on February 28, 2008, I electronically filed this PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

> Douglas H. Duerr
> duerr@elarbeethompson.com

Respectfully submitted this 28th day of February, 2008.

<u>s/Janet E. Hill, Esq.</u>
Janet E. Hill, Esq.
Georgia Bar No. 354230
Attorney for Plaintiff
HILL & ASSOCIATES, P.C.
1160 S. Milledge Ave, Suite 140
Athens, Georgia 30605
Telephone: (706) 353-7272
Fax: (706) 549-8446